IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

ETHELYN ROSS, *individually and as*   §
*independent administrator of the estate of*   §
*Diamond Ross*, AND CLARENCE   §
MCNICKLES,   §
  §
        Plaintiffs,   §
  §
v.   §      CIVIL ACTION NO. 3:20-cv-1690-E
  §
CITY OF DALLAS, et al.,   §
  §
        Defendants.   §

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants Larry Moody and William Ortega's Motion for Summary Judgment Based on Qualified Immunity (Doc. 23). The Court carefully considered the motion, the response, and the reply, as well as the supporting appendices, applicable law, and any relevant portions of the record. For reasons that follow, the Court grants the motion in part and denies it in part.

### Background

Following the tragic death of their daughter Diamond Ross ("Ross"), Plaintiffs Ethelyn Ross and Clarence McNickles brought this action against the City of Dallas and Dallas Police Department Officers Larry Moody and William Ortega. While in police custody, Ross was transported to the hospital and died the next day from the "toxic effects of phencyclidine (PCP)." Ethelyn Ross and McNickles filed separate lawsuits that were consolidated on the unopposed motion of the Defendants.

Plaintiffs did not amend their complaint following consolidation. McNickles's sole claim against the officers is one that Ethelyn Ross also pleads, a claim that they violated Ross's constitutional rights by failing to provide medical care. The allegations in this paragraph are taken from Ethelyn Ross's Second Amended Complaint. In August 2018, Officers Moody and Ortega responded to a 911 call about a domestic disturbance in South Dallas. When they arrived, they found Ross to be incoherent and in desperate need of medical attention. Paramedics were called. Police body camera footage shows Ross requesting water and complaining of shortness of breath. She stated, "I can't breathe." An officer can be heard stating, "We see her all the time at the QT . . . every time I see her she is high on wet." Yet the officers placed Ross into custody for outstanding warrants and transported her to a detention center rather than to a hospital emergency room. Officers failed to fasten Ross's seatbelt before transport. Plaintiffs allege the dash camera footage showed her gasping for air and also her partial loss of consciousness. They further allege Ross was unresponsive when she arrived at the detention facility. The officers asked Ross to wake up and tried to determine if she was still breathing. They removed her from the patrol car and placed her on the pavement. Plaintiffs allege the officers dragged her into the detention facility and placed her into a holding cell. She was then placed into a wheelchair and left alone in a cell. About six minutes passed before anyone checked on her. An officer lifted her head and it violently snapped back, allegedly demonstrating she was still unconscious. Another officer placed his hand over Ross's mouth to check on her breathing. Plaintiffs allege that about twelve minutes after Ross was dragged into the detention center, paramedics arrived and transported Ross to the hospital where she was pronounced dead. Plaintiffs also allege the City of Dallas recommended changes to the intake procedure at all Dallas detention centers as a result of this incident.

Plaintiffs assert various claims against the City and against Officers Moody and Ortega, individually and in their official capacities.[1] Against the officers, Plaintiffs assert a claim under 42 U.S.C. § 1983 alleging they violated the Fourteenth Amendment because they were deliberately indifferent to Ross's serious medical needs. Citing Chapter 71 of the Texas Civil Practice and Remedies Code, they also assert the following state-law claims against the officers: a willful-and-wanton survival action, a willful-and-wanton wrongful death action, and a negligence claim. The officers contend they are entitled to summary judgment on all claims.

<b>42 U.S.C. § 1983 Claim for Medical Inattention</b>

1. *Qualified Immunity Legal Standard*

The officers contend they are entitled to summary judgment on Plaintiffs' § 1983 claim for medical inattention on the basis of qualified immunity. Qualified immunity shields government officials from liability based on the performance of their discretionary functions. *See Beltran v. City of El Paso*, 367 F.3d 299, 302–03 (5th Cir. 2004). Qualified immunity protects all officials "but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof. *Garcia v. Blevins*, 957 F.3d 596, 600 (5th Cir. 2020). When an officer invokes qualified immunity, the burden then shifts to the plaintiff, who must rebut the defense by establishing a genuine fact dispute as to whether the official's allegedly wrongful conduct violated clearly established law. *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020). The Court still draws all inferences in the plaintiff's favor. *Id.*

---

[1] Ethelyn Ross originally named the Dallas Police Department, the Dallas Fire-Rescue Department, and the Dallas City Marshal's Office as additional defendants. The Court previously dismissed the claims against these entities as they are not jural entities subject to suit.

Plaintiffs must establish material fact issues on two points to survive summary judgment based on qualified immunity. *Baldwin v. Dorsey*, 964 F.3d 320, 325 (5th Cir. 2020). They must adduce facts to show the officers violated Ross's constitutional rights, and they must show the asserted right was clearly established at the time of the alleged misconduct. *See id.* A court may consider either condition first, and if either condition does not obtain, the officers are immune. *Id.*

A pretrial detainee's constitutional right to medical care, whether in prison or other custody, flows from the due process guarantees of the Fourteenth Amendment. *Wagner v. Bay City, Tex.*, 227 F.3d 316, 324 (5th Cir. 2000). Plaintiffs allege an episodic acts-or-omissions claim as opposed to a conditions of confinement claim. Liability for episodic acts or omissions cannot attach unless the official had *subjective* knowledge of a substantial risk of serious harm to a pretrial detainee but responded to that risk with deliberate indifference. *Hare v. City of Corinth, Ms.*, 74 F.3d 633, 650 (5th Cir. 1996). In other words, to prove deliberate indifference, Plaintiffs must show the officers were aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, that they actually drew the inference, and disregarded the risk by failing to take reasonable measures to abate it. *Baldwin*, 964 F.3d at 326. Negligent conduct or inaction by an officer does not violate the due process rights of a person lawfully in custody. *Hare*, 74 F.3d at 640, 645. Rather, the plaintiff must show that officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs. *Kelson v. Clark*, 1 F.4th 411, 417 (5th Cir. 2021). Deliberate indifference is an extremely high standard to meet. *Id.*; *Dyer*, 964 F.3d at 380. Moreover, a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm. *See Mendoza v. Lynaugh*, 989 F.2d 191, 195 (5th Cir. 1993).

4

2. *The Parties' Arguments*

The officers argue they are entitled to qualified immunity on the § 1983 claim because Plaintiffs cannot overcome either prong of a qualified immunity defense.  First, the officers contend they did not violate Ross's constitutional right to medical care because:  (1) they did not have subjective knowledge of facts from which an inference of substantial risk of serious harm could be drawn, nor did they actually draw the inference; (2) they did not intend to harm Ross;[2] and (3) because they called paramedics twice, Plaintiffs can only claim they delayed medical care and cannot show any delay in medical care resulted in substantial harm.  Second, the officers contend Plaintiffs cannot establish that their conduct was objectively unreasonable and violated a constitutional right that was clearly established at the time of the incident.  The officers' appendix in support of their motion for summary judgment includes the following evidence:  a DVD of the video evidence; the declarations of Officers Moody and Ortega; two Prehospital Care Report Summaries from Dallas-Fire Rescue regarding their treatment of Ross; and Ross's autopsy report and cause of death report.

Plaintiffs respond that the officers are not entitled to qualified immunity.  Regarding the first prong of the qualified-immunity analysis, they argue the officers were aware of facts to draw an inference of a substantial risk of serious harm, citing the facts that Ross was unresponsive, experienced a rapid decline, and the officers were notified that she might be under the influence of narcotics.  Plaintiffs also assert the evidence demonstrates that the officers acted with deliberate

---

[2] In their joint response to the officers' motion for summary judgment, Plaintiffs assert they are not required to show the officers subjectively intended to harm Ross.  Plaintiffs are correct, and the Court will  not resolve the motion for summary judgment on the officers' argument about intent to harm.  *See Garza v. City of Donna*, 922 F.3d 626, 634–36 (5th Cir. 2019) (clarifying that, although language in some Fifth Circuit decisions about subjective deliberate indifference has required plaintiff to show subjective intention that harm occur, proof that official subjectively intended harm is not required).

indifference. Plaintiffs assert that fact issues exist as to when Ross stopped breathing at the detention center and the effect of the delay in medical treatment. Regarding the second prong of the analysis, Plaintiffs assert Ross's right to medical treatment while in custody was clearly established. Plaintiffs' appendix in support of their summary judgment response includes deposition testimony of Moody and Ortega and portions of a report from an Internal Affairs investigation of Ross's death.

3. *Analysis*

The officers' brief and supporting appendix contain additional information about their encounter with Ross. On August 18, 2018, Senior Corporal Moody, a field training officer, was training and supervising Recruit Officer Ortega as they responded to calls. Ortega had completed six months of training at the police academy and was about halfway through his field training. At about 5:40 a.m., they responded to a call about a major disturbance. The dispatcher informed the officers that the caller, later identified as Johnny Brown, reported that a woman he knew, later identified as Ross, had come to his residence and started an argument. When the officers arrived, Brown met them outside and described what had occurred. According to Brown, Ross came to his house every morning at about 5 a.m. and caused disturbances. That morning, she punched her fist through some cardboard that surrounded his bedroom-window air-conditioning unit. She later entered Brown's house and physically attacked him. Brown called the police to remove her from his home.

The officers went into Brown's house and found Ross asleep in a bedroom. Officer Ortega attempted to question her, but she refused to answer questions or identify herself and she denied that anything had happened. After several minutes, Ross gave Officer Ortega her name. She then began moving rapidly around the room, grabbing objects, and reaching into drawers. The officers

were concerned because they did not know whether there were weapons on her person or in her reach. Ross ignored their commands to sit still. Ross grabbed a pair of shorts and reached into a pocket. Officer Ortega took the shorts from her because the pockets had not been searched. Ross tried to take the shorts back. Because of the "physical escalation," the officers decided to arrest and handcuff Ross. Ross resisted arrest by thrashing her torso and kicking her legs. The officers handcuffed her and escorted her from the bedroom. Ross managed to free her left wrist from the handcuffs and swung her right arm at the officers, trying to hit them with the handcuffs. Ross fought against the officers as they tried to regain control of her. The officers eventually refastened the handcuffs. Ross refused to walk out of the house, and the officers had to carry her outside. She agreed to walk to the patrol car, but dropped to the ground when they reached the street. Ross resisted being placed in the backseat of the car by standing erect and screaming. Once inside the car, Ross rolled around the backseat and kicked the partition and windows. After officers removed Ross from Brown's residence, Brown told Moody that Ross was probably high on PCP.

According to Moody, Brown did not express concerns for Ross's health, and Ross never requested medical attention. Moody took the initiative to summon paramedics. Moody's affidavit states that he wanted paramedics to determine whether Ross needed medical care and whether it was safe to transport her to the City Detention Center and place her in its custody.[3] At Moody's

---

[3] Plaintiffs take issue with the fact that the officers have proffered their own affidavits and those of other officers present on August 18, 2018, as summary judgment evidence. They contend the statements of interested witnesses may not support summary judgment, but have cited no authority for that direct proposition. When a party objects to an affidavit because an affiant is an interested party, there is no rule that requires exclusion of evidence on that basis alone. *377 Realty Partners, L.P. v. Taffarello*, 561 F.Supp.2d 659, 662 (E.D. Tex. 2007). As long as an affidavit is clear, direct, and free from contradictions and inconsistences, then summary judgment may be granted based upon the affidavits of interested parties. *Id.*

Further, Plaintiffs contend statements in Moody's declaration about Ross's past behavior or drug use are hearsay. The Court finds these statements were not offered to prove the truth of the matter asserted, but were offered to prove the information that informed the officers' interactions with Ross while she was in their custody. *See* FED. R. EVID. 801(c).

direction, Ortega contacted the dispatcher and requested an ambulance and a female officer to search Ross.

Other officers arrived to provide backup.  Those officers immediately recognized Ross from numerous encounters with her in the neighborhood.  They told Moody they had seen Ross in the same condition the previous day because she was "on the wet" and "she stay like that." Moody's affidavit states that "wet" is a common slang reference to PCP.  One of the cover officers told Moody, and later the paramedics, "We see her all the time . . . at the QT. Every time we see her she's always high on wet."  A cover officer observed Ross's behavior in the patrol car and stated, "[S]he'll tire herself out soon.  She'll be real tired."

A Dallas Fire-Rescue ambulance arrived at 6:22 a.m. Ross kicked at the officers as they removed her from the patrol car and seated her on the curb for examination.  She then lay down and rolled partially under the car.  A paramedic noted "Provider Impression:  Drug(s)/OD (Suspected or Confirmed)" and found that all of her vital signs were within normal levels.  The paramedic's report also noted that Ross was a "known drug user" and that her only complaint was that she was thirsty.  Paramedics cleared her for transport to a detention center.  Paramedics did not tell Moody that Ross needed water.  No paramedic told Moody or Ortega that Ross had any immediate medical needs or was in any risk of serious harm or instructed them to handle Ross in any particular way.

Moody and Ortega departed for the detention center with Ross.  A camera inside the patrol car recorded Ross during the 17-minute drive.  During the drive, Ross moved all over the back seat and kicked the car.  Her movements decreased as the trip went on, but she moved around the back seat for most of the ride.  Two minutes before they arrived at the detention center, she moved into a seated position in the corner of the back seat.  She continued to move her legs and move her

head.  When they arrived at the detention center at 6:51 a.m., Officer Ortega thought Ross was asleep.  He gently shook her shoulder and told her to wake up.  She was visibly and steadily breathing with no apparent distress.  Officer Ortega slid her out of the back seat until she was leaning against the car. She was unresponsive, but Ortega saw her chest rising and falling and saw her moving her right foot and relayed that information to Moody. Moody stated, "She's breathing, and Ortega responded, "Yeah, she's good." Moody, who had been a Dallas police officer for eleven years and had responded to hundreds of calls involving intoxicated people, did not believe Ross needed immediate medical attention because he did not personally observe any signs of distress, paramedics had examined her and cleared her for transport less than 20 minutes prior, he believed she had simply fallen asleep, and based on his experience, he knew intoxicated people reacted differently to substances, including passing out or falling asleep, without requiring medical attention.

The officers carried Ross into the detention center.  They put her down briefly to remove and secure their firearms.  Moody and Ortega then drag Ross a few feet across the floor to a holding cell in the booking area.  Moody confirmed that Ross was still breathing and in no apparent distress.  At about 6:54 a.m., a detention officer brought a wheelchair into the holding cell.  The officers lifted Ross from the floor and sat her in it.  The officers left the cell, and Ortega went to the next room to complete required paperwork.  Ross was not left alone in the booking area; there were multiple officers present.  At about 6:58 a.m., Moody went into the holding cell to check on Ross.  He saw her chest moving as she breathed.  Moody moved the wheelchair against a wall to prop Ross's head up to reduce the risk of asphyxiation if Ross vomited.  Ross remained in the cell until the paperwork was approved and a female detention officer arrived to process her.  At about 7:03 a.m., Moody entered the holding cell and wheeled Ross to the detention officer's booking

area.  When Ross did not respond to questions, the detention officer used sternum rubs and other methods to arouse her without success.  The officers first became aware that something might seriously be wrong with Ross when they saw that Ross did not respond to the sternum rubs.  At about 7:05 or 7:06 a.m., Officers Moody and Ortega approached Ross and determined she was not breathing.  At 7:06 a.m., Moody called 911.  Paramedics arrived about six minutes later, at 7:12 a.m.  They began CPR and transported Ross to the hospital.  She died the next day.  The medical examiner's report lists the cause of death as "the toxic effects of phencyclidine (PCP)."

For purposes of resolving the officers' motion, the Court will assume without deciding that Plaintiffs have shown the officers were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and that they actually drew the inference.  Even so, Plaintiffs have not met their high burden to demonstrate the officers responded to that risk with deliberate indifference.  In other words, Plaintiffs have not shown the officers' conduct equated to a refusal to treat Ross or similar conduct that would clearly evince a wanton disregard for her serious medical needs. *See Kelson*, 1 F.4th at 417.

Having reason to believe Ross was on drugs, the officers called paramedics for her before they took her to the detention center.  The officers only took her to the detention center after paramedics determined her vital signs were normal and cleared her for transport. When the officers and Ross arrived at the detention center at 6:51 a.m., the officers observed that she was visibly and steadily breathing with no apparent distress. The two of them commented on the fact that she was breathing.  After they took Ross inside, Officer Moody confirmed that she was still breathing. Then again at about 6:58 a.m., Moody went into the holding cell to check on Ross and observed her chest moving as she breathed. He moved her wheelchair in order to prop her head up against the wall to reduce her risk of asphyxiation if she vomited.  Moody wheeled Ross to the booking

area at 7:03 a.m.  Officers Moody and Ortega first became aware that something might be seriously wrong with Ross when she did not respond to the sternum rubs.  At about 7:05 or 7:06 a.m., the officers approached her and determined she was not breathing.  Moody called 911 at 7:06 a.m. It is important to note that the Ross is only at the detention center for a matter of minutes before paramedics are called.  They pull into the detention center parking lot at 6:51 a.m., and Moody calls for an ambulance 15 minutes later.

To show deliberate indifference, Plaintiffs argue the officers ignored Ross's complaints and requests, attempting to draw a comparison to *Kelson*.  They refer to Ross's complaints about not being able to breathe and her unanswered requests for "water while detained in August in Texas."  The Court does not find any deliberate indifference in the way the officers handled the requests for water and the statements about not being able to breathe, which occurred before she arrived at the detention center.  Ross states that she cannot breathe while sitting alone in the back of the patrol car before the paramedics arrive.  She was examined by paramedics and cleared for transport after she complained of not being able to breathe.  Ross makes a few requests for water when she is seated in the back of the patrol car before the paramedics arrive and after they examine her.  She makes numerous requests for water while the paramedics are examining her.  The paramedics did not indicate to the officers that Ross needed any water.

Plaintiffs also rely on the fact that the DPD Internal Affairs Division found that Senior Corporal Moody violated DPD Patrol Bureau Standard Operating Procedure 801(D)(4), which involves contact with intoxicated persons.  Among other things, this provision requires an officer who comes in contact with an intoxicated person to order an ambulance if the person remains unconscious or semiconscious.  Internal Affairs determined that Moody violated this provision when he "failed to obtain medical treatment for an unresponsive prisoner."  The Court notes that

Plaintiffs failed to proffer the complete Internal Affairs report.  The report is at least 28 pages long, but Plaintiffs have only provided a few pages of it in their appendix.  In any event, the Court agrees with the officers that "a determination that an officer's conduct violated his department's internal rules or procedures is not evidence that the officer violated a constitutional right."  This determination has no bearing on the Court's evaluation of whether the officers acted with deliberate indifference.

Nor is the Court persuaded there are material fact issues that prevent summary judgment. In arguing there is a material fact issue about when Ross stopped breathing, Plaintiffs cite the video from the detention center.  They assert the "footage does not show Ms. Ross' chest moving up or down, any movement consistent with breathing, or any movement."  The Court cannot conclude that the video creates a fact issue because the Court cannot be certain the video would show Ross's or anyone else's chest moving from breathing.  The video is not the highest quality and Ross is not that close to the camera, especially when she is in the detention cell, which has cyclone-fence-like walls.   Further, for purposes of reviewing the motion for summary judgment on qualified immunity, the material issue is the officers' subjective deliberate indifference.   Thus, for the Court's purposes, the issue is not when Ross stopped breathing, but when the officers realized she stopped breathing.  The officers' uncontroverted summary judgment evidence shows they became aware at about 7:05 a.m. and immediately called for an ambulance.  The Court concludes that the officers' actions, which include having Ross checked out by paramedics before transporting her to the detention center, checking several times at the detention center that she was breathing, taking steps to ensure she did not asphyxiate, and calling paramedics again as soon as they realized she had stopped breathing, do not demonstrate deliberate indifference. *Cf. Kelson*, 1 F.4th at 418–19

(upholding denial of motion to dismiss where paramedics entirely failed to treat person despite his protestations and visible head injury).

In addition, because the officers sought medical assistance for Ross, this case involves a delay in medical care.  A delay in providing medical care is not a constitutional violation of the right to medical care unless it results in substantial harm.  *See Lacy v. Shaw*, 357 F. App'x 607, 609 (5th Cir. 2009).  Plaintiffs' only response to the officers' argument about the delay in medical treatment is to again assert there is a fact issue about how long Ross had stopped breathing before medical care was summoned.  Plaintiffs have not presented any medical evidence to demonstrate that any delay in calling for an ambulance, which at most was just a matter of minutes, contributed to Ross's death from a drug overdose. *See Batyukova v. Doege*, 994 F.3d 717, 733 (5th Cir. 2021) (plaintiff did not present evidence that delay in medical treatment caused substantial harm where no indication that delay between decedent being shot and being approached by EMS or law enforcement increased risk of death).

Because Plaintiffs have not met their heavy burden to show the officers' deliberate indifference and have not shown that any delay in medical treatment resulted in substantial harm, the Court grants the officers' motion for summary judgment as to Plaintiffs' § 1983 claims against them in their individual capacities.  Accordingly, the Court grants the officers' motion for summary judgment as to these claims.  Without any citation to legal authority, Plaintiffs ask the Court for leave to amend their pleadings or summary judgment proof in the event the Court finds any deficiency in pleading or proof.  The Court denies the request for leave, finding it inappropriate at this stage in the proceedings.

4. *Official Capacity Claims*

In addition to their individual capacity claims addressed above, Plaintiffs assert § 1983 claims against the Officers in their official capacities. An official capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009). It is not a suit against the official personally, for the real party in interest is the entity, here, the City of Dallas. *See id.* Because the Court must treat any claims Plaintiffs bring against the officers in their official capacities as claims against the City, Plaintiffs' official capacity claims are redundant. Accordingly, the Court dismisses Plaintiffs' section 1983 official capacity claims against the individual defendants. *See Clyce v. Hunt Cty., Tex.*, No. 3:09-CV-0351-N, 2010 WL 11626676, at *4 (N.D. Tex. Aug. 24, 2010).

**State-Law Claims**

As for Plaintiffs' state-law claims for wrongful death, survival, and negligence, the officers contend they are entitled to summary judgment because those claims are barred by § 101.106 of the Texas Tort Claims Act. Section 101.106 is titled "Election of Remedies." The subsection upon which the officers rely, section 101.016(e), provides that if a suit is filed under the tort claims act against both a governmental unit and any of its employees, the employees shall immediately be dismissed on the filing of a motion by the governmental unit. TEX. CIV. PRAC. & REM. CODE ANN. § 101.106(e).

Although Plaintiffs' summary judgment response does not include any mention of their state-law claims or § 101.106, the Court concludes the officers have not established their entitlement to summary judgment on these claims. The plain language of § 101.106(e) requires "the filing of a motion by the governmental unit." *Id.* The officers' summary judgment brief represents that the "City of Dallas will seek the dismissal of [Plaintiffs'] state-law claims against

14

the Officers."   However, no such motion has been filed by the City, and the officers' own motion

cannot trigger their dismissal under § 101.106(e).  *See Gonzales v. Hunt Cty. Sheriff's Dep't*, No.

3:20-CV-3279-K, 2021 WL 2337143, at *12 (N.D. Tex. June 8, 2020) (Kinkeade, J.).

Accordingly, the Court denies the officers' motion for summary judgment as to Plaintiffs' state-

law claims.

       **SO ORDERED.**

       Signed March 31, 2022.

_____

ADA BROWN
UNITED STATES DISTRICT JUDGE

15